UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,               No. 79-CV-73934-DT

vs.                                   Hon. Gerald E. Rosen

CERTAIN LAND SITUATED IN THE
CITY OF DETROIT, et al.,

                  Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANT DETROIT
INTERNATIONAL BRIDGE COMPANY'S MOTION TO RECOVER FEES
AND EXPENSES PURSUANT TO THE EQUAL ACCESS TO JUSTICE ACT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      March 6, 2009

PRESENT:  Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I. INTRODUCTION

This 1979 condemnation action, which was tried before a jury in February 2002 on the issue of just compensation, is presently before the Court on the Motion of Defendant Detroit International Bridge Company ("DIBCO") to recover $2,822,682.30 for attorneys' fees and expenses it incurred in this case pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (the "EAJA").  The Government has responded to DIBCO's motion and DIBCO has replied.

1

Having reviewed and considered Defendant's Motion, the parties' briefs, and the Court's record of this matter, the Court has determined that oral argument is not necessary.  Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

This condemnation action has a long a protracted history which has been detailed in a number of published opinions.[1]  The case started in 1979 when the Government sought to obtain three parcels of land located near the Ambassador Bridge through eminent domain.  DIBCO owned two of the parcels which it had acquired a few years earlier with an eye towards alleviating bridge congestion.[2]  The larger of the two parcels, which DIBCO purchased in 1977 for $1.2 million, had housed a truck terminal used by the previous owner, Overland-Western Corporation.

Before purchasing the Overland parcel, DIBCO informed the Government of its

---

[1]  *See United States v. Certain Land*  547 F. Supp. 680 (E.D. Mich. 1982); *United States v. Detroit Intern. Bridge Co.*, 7 F.3d 497 (6th Cir. 1993); *United States v. Certain Land*, 873 F. Supp. 1050 (E.D. Mich. 1994), *aff'd*, 76 F.3d 380, 1996 WL 26915(6th Cir. 1996), *cert. denied*, *Commodities Export v. United States*, 519 U.S. 819 (1996) ; *United States v. Certain Land*, 43 F. Supp. 2d 762 (E.D. Mich. 1999); *United States v. Certain Land*, 178 F. Supp. 2d 792 (E.D. Mich. 2001); *United States v. Certain Land*, 188 F. Supp. 2d, 747 (E.D. Mich. 2002) and *United States v. Certain Land*, 286 F. Supp. 2d 865 (E.D. Mich. 2003), *aff'd,* 450 F.3d 205 (6th Cir. 2006), *cert. denied*, 549 U.S. 1278 (2007); *United States v. Certain Land*, 361 F.3d 305 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

[2]  The third parcel, which was owned by Nash Sogoian, separated the parcels owned by DIBCO.  Sogoian's parcel was acquired in the same condemnation proceeding.

intentions and the Government responded favorably that it was contemplating leasing space on the property to carry out secondary Customs truck inspections.  However, negotiations concerning leasing DIBCO's property broke down, and on October 11, 1979, the Government instituted these proceedings, filed a Declaration of Taking, and took possession of the property in 1980.

Initially, the Government valued the two parcels at $828,000, and this amount was paid to DIBCO in 1980.  DIBCO thereafter sought further compensation through litigation and settlement negotiations.  These settlement negotiations, in turn, spawned yet further litigation.

In 1991, the Government and DIBCO agreed to settle the condemnation proceeding pursuant to a Memorandum of Agreement ("MOA") under which the Government agreed to enlarge the scope of its Customs inspection expansion and condemn other properties, including the totality of a parcel owned by Commodities Export Company and Walter Lubienski.  Commodities and Lubienski operated a duty-free shop on the property which competed directly with Ammex, another duty free shop located at the foot of the Ambassador Bridge.  Ammex is owned by the Manuel J. Moroun family, which also owns and controls DIBCO.

The MOA called for the Government to pay DIBCO $1.24 million as compensation for the two parcels of land owned by DIBCO which were being condemned, and DIBCO, in turn, agreed to pay the Government for the costs of acquisition of the other properties, including the property owned by Commodities Export

3

and Lubienski.

In response to challenges to the MOA launched by Commodities and Lubienski, the Government retreated from its stated intent to take the totality of Commodities' property, and for nearly eight years avowed -- in pleadings, in on-the-record hearings, and in chambers conferences -- that it had no intent of putting Commodities out of business, and that it only needed to take in fee a small corner of Commodities' parking lot to complete a truck ramp off of the Bridge, and an easement across the parking lot for access to a to-be-constructed government parking lot on adjacent property.  Ultimately, in 1996, condemnation actions against the Commodities and Lubienski properties were filed to take the small portion of the Commodities parking lot as had been represented by the Government.

In light of these representations by the Government, the Court and the Sixth Circuit rejected Commodities' and Lubienski's repeated arguments that the Government and its competitors had colluded to put them out of business through a condemnation process financed in part by the competitor under the auspices of the MOA.  However, rather than put an end to Commodities dispute, the Government's representations of intent to take only a small portion of Commodities property and not put Commodities out of business engendered a whole new round of litigation.

On the eve of trial on the issue of just compensation owed to Lubienski and Commodities, the Government filed a new condemnation action to take all of Commodities property.  Then, when the Government, Commodities and Lubienski settled

4

for a significant sum, DIBCO, instead of moving to intervene in the Commodities condemnation to challenge the settlement, sought to reopen the 1979 condemnation action on the grounds that the MOA had been breached and the Agreement was, therefore, rendered null and void.  The Government agreed that the MOA was no longer operative. Therefore, the 1979 condemnation action proceeded to trial.

The matter was tried before a jury in February 2002 on the issue of just compensation for the Government's taking of the two parcels of land owned by DIBCO.

During the trial, the Government's expert, David Treadwell, testified that the highest and best use of the Overland parcel was as a truck terminal.  Based on this conclusion, Mr. Treadwell valued the Overland parcel at $875,000.  Mr. Treadwell valued the smaller DIBCO parcel at $48,000, for a total value of the condemned property of $923,000.

DIBCO landowner witness, Manuel J. Moroun testified that, in his opinion, the property was worth $13,000,000.  DIBCO's appraiser, William P. Walsh, gave two alternative values.  Based on the integrated use of the property as part of the adjacent Bridge property, Mr. Walsh valued the property at $8,150,000.  Based on the property's use as a bonded warehouse or some other such facility having an enhanced market value due to the proximity of the property to the Ambassador Bridge, Mr. Walsh valued the parcels at $598,161 (Parcel 1) and $5,549,100 (Parcel 2), for a total value of 6,147,261.

The Court, however, limited the jury's consideration of Mr. Moroun's and Mr. Walsh's "integrated use" valuations.   With respect to Mr. Moroun's testimony, the Court

5

instructed the jury:

> THE COURT: I want to give the jury -- again, I want to give the jury a cautionary instruction. You can consider this as to what Mr. Moroun's own value that he attributed to was.
>
> But in terms of reaching the ultimate issue on the valuation of the properties, you cannot consider it for that purpose.

[2/13/02 Tr. p. 558]

> With respect to Mr. Walsh's testimony, the Court instructed the jury:
>
> THE COURT: Ladies and gentlemen, you heard testimony on Friday from Mr. Walsh in which he indicated that the value of the property that has been taken by the Government was $50 per square feet -- $50 per square foot, when valued in conjunction with the bridge as part of a use on the bridge.
>
> I have ruled that that is not compensable. That is not a compensable use.
>
> In other words, you may not take into consideration the value of the property when it is used in conjunction with the bridge or together with the bridge itself. That is known as a special use or a peculiar use to the owner of the bridge property at the time. That is not compensable.
>
> However, I have also ruled that you may consider the property as being valued because of its location approximate to the bridge or near the bridge.
>
> In other words, you may take into account its location as being near the bridge in arriving at what its highest and best use is. I will give you an instruction on that.
>
> But I am now instructing you that the testimony Mr. Walsh gave you on Friday concerning the use of the property, the $8 million figure, when it is used in conjunction with the bridge, must be disregarded, cannot be considered by you. . . .

[2/19/02 Tr. p. 877-78.]

6

After six days of trial, the jury returned a verdict awarding DIBCO $4,098,174 as just compensation for the two parcels.[3]  A Judgment in favor of DIBCO for that amount was subsequently entered on February 20, 2002.  The Judgment was later superseded by an Amended Judgment in the total amount of $2,858,174 entered on September 30, 2003 which reflected deductions for the Government's previous deposits with the Court and payments to DIBCO of $828,000 and $412,000.[4]

DIBCO thereafter appealed to the Sixth Circuit Court of Appeals arguing that the amount awarded by the jury was inadequate because the District Court had precluded the jury from considering its proffered valuation theories based upon (1) lost profits alleged suffered by the Ambassador Bridge (which was adjacent to one of the parcels of property) and/or (2) the diminution in the value of its property after the taking (i.e., the difference between the before and after taking value of the Bridge and the adjacent property taken) contending that the highest and best use of the condemned parcel adjacent to the bridge was its integrated use as a part of the Ambassador Bridge.[5]

The Sixth Circuit rejected all of DIBCO's arguments and on June 8, 2006, affirmed this Court's Judgment in all respects.  *See United States v. Certain Land*, 450

---

[3]  The jury awarded DIBCO $398,774 for Parcel 1 and $3,699,400 for Parcel 3 (the "Overland" parcel).

[4]  A Stipulated Final Judgment Awarding Interest was thereafter entered on October 24, 2003.

[5]  DIBCO also appealed the District Court's calculation of interest based upon the Declaration of Taking Act.

7

F.3d 205 (6th Cir. 2006).  DIBCO subsequently petitioned the Supreme Court for a writ

of *certiorari.*  The Supreme Court denied the writ.  *See Detroit International Bridge Co.*

*v. United States*, 549 U.S. 1278 (Mar. 19, 2007).

Thereafter, on April 18, 2007, DIBCO filed the instant "Motion to Recover Fees

and Expenses Under 24 [sic; 28] U.S.C. § 2412," which was supported by an initial Brief,

a Supplemental Brief filed on June 1, 2007, and three 3-inch thick binders of exhibits.  In

this Motion, DIBCO seeks an award of attorneys' fees and expenses in the amount of

$2,822,682.30.  After being granted several extensions of time,[6] the Government

responded to DIBCO's motion.  DIBCO has replied.

## III.  DISCUSSION

### A.    THE EQUAL ACCESS TO JUSTICE ACT

The primary purpose of the Equal Access to Justice Act, 28 U.S.C. § 2412 (the

"EAJA") is "to ensure that certain individuals, partnerships, corporations. . . or other

organizations will not be deterred from seeking review of, or defending against,

unjustified governmental action because of the expense involved. . . ." H.R.Rep. No. 120,

99th Cong., 1st Sess. 4, reprinted in 1985 U.S.Code Cong. & Ad.News 132, 132-33.  *See*

*also Scarborough v. Principi*, 541 U.S. 401, 124 S.Ct. 1856, 1861 (2004); *Sullivan v.*

---

[6] Extensions were granted because new counsel had then only recently been appointed to represent the Government in this matter and the trial attorneys who formerly represented the Government were no longer employed by the Environment and Natural Resources division of the Department of Justice and, therefore, not available to assist new counsel in responding to DIBCO's motion.

*Hudson*, 490 U.S. 877, 883, 109 S.Ct. 2248, 2253 (1989).  To further this purpose, the

EAJA shifts to the United States a prevailing party's litigation expenses that that party

incurred while contesting unreasonable government action.  *Meyers v. Heckler*, 625 F.

Supp. 228, 230 (S.D. Ohio 1985).

The EAJA, thus, provides a limited exception to the general rule of sovereign

immunity where recovery of costs against the United States is concerned.  *Tri-State Steel*

*Const. Co., Inc. v. Herman*, 164 F.3d 973, 977 (6th Cir. 1999) (quoting *National Truck*

*Equip. Ass'n v. NHTSA*, 972 F.2d 669, 671 (6th Cir. 1992)).  "The exception should not

be construed liberally."  *Id.*

In pertinent part, the EAJA provides as follows:

> Except as otherwise specifically provided by statute, a court shall award to
> a prevailing party other than the United States fees and other expenses, in
> addition to any costs awarded pursuant to [28 U.S.C. § 1920], incurred by
> that party in any civil action (other than cases sounding in tort). . . brought
> by or against the United States in any court having jurisdiction of that
> action, unless the court finds that the position of the United States was
> substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

Subsection Section (d)(1)(B) of the statute delineates the procedural

requirements for an EAJA fee application:

> (B)  A party seeking an award of fees and other expenses shall, within
> thirty days of final judgment in the action, submit to the court an
> application for fees and other expenses which shows that the party is a
> prevailing party and is eligible to receive an award under this subsection,
> and the amount sought, including an itemized statement from any attorney
> or exert witness representing or appearing in behalf of the party stating the

actual time expended and the rate at which fees and other expenses were computed. The party shall also allege that the position of the United States was not substantially justified. Whether or not the position of the United States was substantially justified shall be determined on the basis of the record. . . which is made in the civil action for which fees and other expenses are sought.

The statute also provides express definitions of its terms. Subsection (d)(2)

provides, in relevant part:

(2) For purposes of this subsection --

(A) "fees and other expenses" includes the reasonable expenses of expert witnesses. . . and reasonable attorney fees. (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee;

(B) "party" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed. . . ;

* * *

(G) "final judgment" means a judgment that is final and non appealable, and includes an order of settlement;

(H) "prevailing party", in the case of eminent domain proceedings, means a party who obtains a final judgment (other than by settlement), exclusive of interest, the amount of which is at least as close to the highest valuation of the property involved that is attested to at trial on behalf of the property

10

owner as it is to the highest valuation of the property involved that is
attested to at trial on behalf of the Government[.]

28 U.S.C. § 2412(d)(2)(A)-(B); (G)-(H).

At issue in this case is whether DIBCO has demonstrated that it meets the EAJA's
statutory requirements. DIBCO claims that it has done so; the Government disputes this.
Specifically, in opposing DIBCO's fee application, the Government argues (1) that
DIBCO cannot establish that it meets the EAJA's "prevailing party" requirement; (2) that
the real party-in-interest in this case is DIBCO's parent company, CenTra, and DIBCO
has not demonstrated that CenTra qualifies as a "party" under the statute; (3) even if
DIBCO can meet these criteria, the Government's position was substantially justified,
and (4) special circumstances make an EAJA award unjust.

B.   DIBCO IS AN ELIGIBLE "PARTY" UNDER THE EAJA

Because the Court finds that it makes more sense to determine first whether
DIBCO is a "party" eligible under the statute to make an application for attorneys fees
before determining whether it qualifies a "prevailing party" to be entitled to a fee award,
the Court will address the Government's second argument first.

A "party" eligible to receive attorneys' fees and costs under the EAJA is: "(i) an
individual whose net worth did not exceed $2,000,000 at the time the civil action was
filed, or (ii) any owner of an unincorporated business, or any partnership, corporation,
association, unit of local government, or organization, the net worth of which did not
exceed $7,000,000 at the time the civil action was filed, and which had not more than

11

500 employees at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B).  The

Government does not take issue with DIBCO's evidence supporting its claim that, as of

October 11, 1979, when this action was filed, DIBCO's net worth did not exceed

$7,000,000 nor did the company have more than 500 employees.  Instead, the

Government argues that the "real party in interest" in this case for purposes of a fee

award is not DIBCO, but rather DIBCO's parent company, CenTra, Inc., and DIBCO has

not presented any evidence to establish that CenTra meets the net worth and employee

requirements of § 2412(d)(2)(B).[7]

In support of its position, the Government relies upon *United States v. Lakeshore

Terminal and Pipeline Co.*, 639 F. Supp. 958 (E.D. Mich. 1986). In that case, the

government had entered into a contract with the defendant's predecessor-in-interest,

American Fuel to construct a petroleum storage facility and provide petroleum storage

and terminalling services in Harrisville, Michigan to service Wurtsmith Air Force Base.

The three-year contract, which was renewable for 15 successive three-year terms, gave

the government an option to purchase the facilities at a price determined pursuant to  a

formula set forth in the contract.  During the second renewed term of the contract,

Lakeshore purchased the Harrisville facilities from American Fuel and assumed all of the

contractual rights and obligations of American Fuel.

---

[7]   DIBCO does not dispute, however, the Government's contention that CenTra
would not qualify as a "party" under the statute.

12

The United States thereafter notified Lakeshore that it intended to exercise is option to purchase.  Believing it had fully compensated American Fuel for the construction costs of the facility as it had paid American Fuel more than $3.3 million during the first eight years of the contract, the United States felt it was entitled to have the facility transferred to it for zero dollars.  Lakeshore responded -- through its parent company, the Detroit and Mackinac Railway Company -- that it disagreed with the government's assessment and stated that it valued the property at $6,000,000.

The government thereafter filed a declaratory judgment action seeking a declaration that it was entitled to the title of the Harrisville facility at $0.  The court ultimately granted summary judgment in favor of Lakeshore.

Lakeshore subsequently filed an application for attorneys' fees and costs pursuant to the EAJA.  The court rejected that application finding that the real party-in-interest was not Lakeshore but rather Lakeshore's parent company, the Detroit & Mackinac Railway Company.   In reaching this conclusion, the court relied not only upon the fact "that Lakeshore is a wholly owned subsidiary of the Detroit & Mackinac Railway Company," but also the "many facts [that] suggest[ed] that Lakeshore and the Detroit & Mackinac Railway Company are not autonomous and independent companies." *Id.* at 962.  In particular, the court noted that

> . . . [T]he Detroit & Mackinac Railway Company performs various administrative, accounting, insurance and auditing functions at Lakeshore. Additionally, both companies have the same president and occupy the same offices.  In fact it is the Railway Company that owns the pipeline that runs

13

between the Harrisville facility and Wurtsmith Air Force Base. . . . [The court] finds the interest and involvement of the Detroit & Mackinac Railway Company in this case even more persuasive.  The interest of the Railway Company in this case can only be described as one of active involvement.  It was, after all, the General Counsel of the Detroit & Mackinac Railway Company, Michael Biber, that initially responded to the government's notice that it intended to exercise its option to purchase the Harrisville facility.  Mr. Biber's letter of August 10, 1977 to the Defense Petroleum Supply Agency was sent on letterhead of the Detroit & Mackinac Railway Company and was signed by Mr. Biber as General Counsel for the Railway Company.

Similarly, in responding to a [discovery] request to explain the reason why Lakeshore purchased the Harrisville facility, Lakeshore responded:

> *Answer*: The Detroit and Mackinac Railway has always maintained an interest in acquiring property in the Harrisville and Tawas, Michigan areas. . . . (emphasis added).

*Id.*

Based upon the totality of the above facts, the court concluded that the Detroit and Mackinac Railway Company was the real party-in-interest, and because the Railway Company had a net worth in excess of $7 million and employed more than 500 people, it did not qualify as a "party" eligible for a fee award under the EAJA.

The Government argues in this case that, as in *Lakeshore*, DIBCO is a wholly owned subsidiary of CenTra.  The Government also points out that there is some interrelation of activities of DIBCO and CenTra as evidenced by the affidavits sworn by CenTra employees attesting to DIBCO's net worth.  The Government further contends that CenTra was actively involved in this litigation and places great weight upon the fact that all of the legal work performed in this case was billed either to CenTra or to one of

14

its other wholly-owned subsidiaries, Central Transport, Inc.  Additionally, Manuel J. Moroun, whose family owns and controls CenTra, testified at trial as the landowner witness on behalf of DIBCO.  According to the Government, under *Lakeshore Terminal*, these facts should persuade the Court to find that CenTra, not DIBCO, is the real party in interest.

The problem with the Government's argument is that it entirely ignores the more recent Sixth Circuit Court of Appeals decision in *Tri-State Steel Const. Co., Inc. v. Herman*, 164 F.3d 973 (6th Cir. 1999), in which the appellate court flatly rejected the application of the "real-party-in-interest" doctrine in the EAJA context.

*Tri-State* involved a petition for review of decision of the Occupational Safety & Health Review Commission denying Tri-State's motion for an award of attorneys fees and expenses under the EAJA.[8]  In that case, the Commission, relying principally upon factors drawn from *Lakeshore Terminal*, concluded that Tri-State was not the real party-in-interest because it was wholly-owned by National Engineering & Contracting Company, shared its board of directors and the safety director, shared office space and purchased services with National even though Tri-State reimbursed National for its share. *Id.* at 979.  The Sixth Circuit reversed, explaining:

---

[8]  The EAJA allows a prevailing party to recover fees in both "any civil action," 28 U.S.C. § 2412(d)(1)(A), or in an "adversary adjudication" conducted by an agency of the United States.  5 U.S.C. § 504(a)(1).  The "party" requirements (i.e., net worth and number of employees) for an award of fees and expenses to a prevailing party in an agency proceeding are the same as in a civil action.  *See* 5 U.S.C. § 504(b)(1)(B); *Tri-State Steel*, 164 F.3d at 977.

15

The Supreme Court. . . recently explained that under "hornbook law" the exercise of control that results from a parent corporation's ownership of stock in a subsidiary corporation does not create liability beyond the subsidiary even where there is duplication of some or all of the directors of executive officers. *See United States v. Bestfoods*, 524 U.S. 51, ___, 118 S.Ct. 1876, 1884, 141 L.Ed.2d 43 (1998). To abrogate such basic common law principles of corporate, law a statute must speak directly to the question. Further, the Court criticized the district court for failing to recognize that "it is entirely appropriate" for directors of a parent corporation to serve as directors of its subsidiary. . . . Further, to the extent that the Commission relied upon the ability of a parent corporation to advance funds, such reliance is inconsistent with the basic premise that a corporation is separate from its shareholders. As Tri-State notes, one district court has stated that "[a]s the term real party in interest connotes, the fact that someone simply advances funds in payment of fees does not resolve the matter if someone else must realistically bear the burden (in this example, via reimbursement)." . . .

164 F.3d at 979 (some citations omitted).

Accordingly, the Sixth Circuit concluded:

Tri-State is a separate corporate entity, litigating on its own behalf, and the interrelationship between Tri-State and its parent corporation cannot justify the Commission's aggregation of Tri-State's assets with those of National for purposes of the EAJA.

*Id. See also Caremore, Inc. v. NLRB*, 150 F.3d 628 (6th Cir. 1998), declining to aggregate net worth or employees of any entities affiliated with employer in determining whether employer was a "party" eligible for attorney fees and costs under the EAJA, explaining:

[W]e have never read the EAJA to include a general aggregation requirement; on the contrary, we have expressly recognized that the EAJA is silent as to the aggregation issue except with respect to certain entities not relevant here. In *National Truck [Equip. Ass'n v. NHTSA*, 979 F.2d 669 (6th Cir. 1992)], we held that a trade association, which itself had only

12 employees and a net worth of less than $850,000, was ineligible for recovery under the EAJA in view of the fact that its constituent members included many of the largest corporations in the Fortune 500. *See id.* at 671. Our rationale, however, was not that the trade association was supported by a large membership and therefore simply was too big for EAJA recovery; instead, we rested our holding on the fact that the association was participating in the litigation on behalf of its members, rather than on its own behalf, and aggregation of the members' finances and employees reflected this fat. *See id.* at 672. Here, Caremore clearly was litigating on its own behalf; the record demonstrates that it is a separately incorporated entity, and that the merits of the underlying case involved a bargaining unit consisting solely of Caremore employees. Moreover, Caremore has submitted a roster of employees that work only at Caremore (under the trade name Altercare of Hartville) and the legal bills in this matter were submitted to Altercare of Hartville. We have no reason to believe that Caremore was litigating on behalf of any other entity, and we therefore decline to aggregate the net worth or employees of any affiliated entities for purposes of determining Caremore's eligibility for fees and costs.

150 F.3d at 630.

*Tri-State* and *Caremore* are controlling authority in this Circuit. These cases demonstrate that the Government's "real party in interest" argument must fail. There is no dispute that DIBCO and CenTra are separately incorporated entities. That the companies have some overlapping directorships and share some employees, or that CenTra may have paid some of DIBCO's legal bills does not alter this. Furthermore, there is no evidence suggesting that DIBCO litigated this matter on behalf of any other person or entity. Under the plain language of the statute, DIBCO is a "party" eligible to receive fees and costs under the EAJA.

C.    <u>DIBCO IS NOT A "PREVAILING PARTY"</u>

17

In order to recover fees and costs under the EAJA, however, it is not enough to simply to demonstrate that the moving party meets the net worth and employee-number requirements set forth in § 2412(d)(2)(B).  DIBCO must also establish that it is a "*prevailing* party."  For purposes of eminent domain actions, the term "prevailing party" is expressly defined in the EAJA.

As set forth in the statute, a "prevailing party"in an eminent domain case is a party who obtains a final judgment that is "at least as close to the highest valuation of the property involved that is attested to at trial on behalf of the property owner as it is to the highest valuation of the property involved that is attested to at trial on behalf of the Government."  28 U.S.C. § 2412(d)(2)(H).   Thus, to qualify as a "prevailing party" under the EAJA, DIBCO must establish that the highest valuation submitted on its behalf at trial is closer to the final judgment than the highest valuation submitted by the Government.  *See United States v. 2.6 Acres of Land*, 251 F.3d 809, 811-12 (9th Cir. 2001); *United States v. 1,002.35 Acres of Land*, 942 F.2d 733, 735 (10th Cir. 1991).

The Government argues that the valuation of its expert, Donald Treadwell, is closer to the $4,098,174 jury award than the highest valuation testimony presented on DIBCO's behalf.  In this regard, the Government compares the proximity of Mr. Treadwell's $923,000 valuation to the jury award to the proximity of  the $13,000,000 valuation testified to by landowner witness, Manuel Moroun, and the $8,150,000 "integrated use" valuation testified to by DIBCO's expert.  Using these figures, the jury

award was $3,175,174 above the Government's expert's highest valuation, and was $4,051,926 below the highest testimony of DIBCO's expert and $8,901,26 below the value testified to by Mr. Moroun.

DIBCO counters that only proper valuation testimony offered on its behalf that may be considered in making the "prevailing party" determination is Mr. Walsh's alternative $6,147,261 valuation based on the property's use as a bonded warehouse or some other such facility having an enhanced market value due to the property's proximity to the Ambassador Bridge because the Court instructed the jury that it could not consider Mr. Moroun's valuation testimony or Mr. Walsh's valuation based on the property's "integrated use" as part of the Bridge property.  DIBCO, thus, reads into the statute a limitation that only *permitted* valuation testimony may be used in determining which party's proffered testimony is closest to the actual award.  Using Mr. Walsh's $6,147,261 figure, DIBCO claims that it is the "prevailing party" because this valuation was only $2,049,087 more than the jury award, i.e., it was closer to the jury award than the $3,175,174 difference between the award and the Government's valuation.

DIBCO has cited no authority for the "permitted testimony only" limitation it reads into the statute, and based upon the Court's independent research of the issue, it appears that this is a question of first impression.

The Government points out that nothing in the plain language of the statute suggests that only *permitted* valuation testimony is to be considered in deciding whether

19

a party is a "prevailing party" for purposes of an award of attorneys fees under the EAJA. The statute speaks only to "the highest valuation of the property involved *that is attested to at trial* on behalf of the property owner [and] on behalf of the Government."  In support of its position, the Government points to two cases, *United States v. 2.6 Acres of Land*, 251 F.3d 809 (9th Cir. 2001) and *United States v. 50.50 Acres of Land*, 931 F.2d 1349 (9th Cir. 1991).

In *2.6 Acres*, the property owner's appraiser testified that the property was worth $891,000, while the owner himself testified that the property was worth $1.25 million. 251 F.3d at 810.  The government's expert testified to a value of $465,500. *Id.*  The jury award of $746,804 was closer to the valuation given by the landowner's appraiser than to the government's valuation. *Id.*  However, the jury award was closer to government's valuation than it was to the landowner's own testimony of $1.25 million. *Id.*

In determining the highest valuation attested to on behalf of property owner, the district court disregarded the valuation offered by the landowner himself and focused exclusively on the valuations offered by the parties' experts, and by so doing, found the landowner to be the "prevailing party." *Id.* at 812.  The district court however, offered no explanation for its decision to disregard the valuation testimony offered by the landowner. *Id.*

On appeal, the Ninth Circuit reversed the district court's award of fees to the landowner.  In so doing, the appellate court specifically rejected the landowner's

argument that a limitation to the phrase in the statute regarding testimony "on behalf of the property owner" should be read into the statute such that only valuations submitted by an appraiser could be considered, and all subjective valuations proffered by the actual property owner excluded.  *Id.*  The appellate court reasoned:

> When interpreting a statute, we look first to the plain language of the statute to interpret its provisions.  The plain language of 28 U.S.C. § 2412(d)(2)(H) supports the government's position that a landowner's valuation of the property must be considered when determining who is a prevailing party under the EAJA.  The statute's requirements that a district court consider the "highest valuation of the property. . . attested to at trial on behalf of the property owner" encompasses testimony offered by a property owner *on his own behalf.*  Contrary to [Defendant's] assertions, the plain language of the statute simply does not suggest that Congress intended for valuation testimony offered by a landowner on his own behalf to be distinguished from the testimony given on his behalf by others.

251 F.3d at 812 (citations and some internal punctuation omitted; emphasis in original).

While *2.6 Acres* certainly supports a "plain language" reading of the statute, nothing in that case, however, indicates that the district court precluded or in any way limited the jury's consideration of the landowner's testimony *at the just compensation trial*, as the Court did in the trial of this matter.

The *50.50 Acres* case is a bit more helpful.

In *50.50 Acres*, the property owners' appraiser testified at trial that the value of the taken land was $5,530,000, which reflected the following computations: "land value, $4,700,000; improvements, $212,000; severance damages, $618,000."  931 F.2d at 1358. The government's witness countered that the value of the land taken by the government

21

was $3,467,000.  *Id.*  Following a bench trial, the district court awarded the property

owner $4,485,771, in just compensation which did not include any severance damages.

The district court thereafter declared the landowner to be the "prevailing party" by

using the pre-1985 version of § 2412(d)(2)(H).[9]  The court, nonetheless, denied the

landowners' EAJA fee application finding that the government's position was

substantially justified.

On appeal, the Ninth Circuit determined that the district court erred in applying

pre-1985 law in deciding the "prevailing party" issue and, concluded that under the

current version of § 2412(d)(2)(H), the government was the prevailing party.  In reaching

this conclusion, the appellate court used the gross valuations submitted by each party at

trial (i.e., the court included the property owners' appraiser's severance damage

valuation) and found that the government's valuation was closer to the actual judgment.[10]

Therefore, the appellate court declared the government to be the prevailing party.  In so

doing, the Ninth Circuit expressly rejected the landowners' argument that, since the

district court did not include severance damages in its award, their appraiser's severance

---

[9]  Prior to the 1985 amendments to the EAJA there was no statutory "prevailing party" standard specific to condemnation actions.  A number of courts, however, adopted the rule that a condemnee who secured a just compensation award substantially greater than the original deposit was considered a prevailing party.  *See e.g., 101.80 Acres of Land*, 716 F.2d 714 (9th Cir. 1983).

[10]  The landowners' appraisal testimony was $1,044,229 greater than the court's award. The government's testimony was $1,018,771 less than the court's award.  931 F.2d at 1358 n. 7.

damages valuation testimony should not be considered in deciding the prevailing party

issue.  The court held that *all* valuation testimony at trial was to be considered.  The court

stated:

> [T]he plain meaning of the statute requires that *all testimony* related
> to the just compensation award should be compared to the court's final
> award. The legislative history of new subsection (d)(2)(H) states that "the
> prevailing party is the one whose testimony in court is closer to the award."
> House Report II at 157. The Fifth Circuit has interpreted this new section to
> mean "that the total valuation of the land is the relevant number to be
> considered when determining which is the prevailing party 'whose
> testimon[ial position] in court is closer to the award (emphasis added).' "
> *United States v. 5,507.38 Acres of Land*, 832 F.2d 882, 883 (5th Cir.1987).
>
> We adopt the rule that *any value testified to at trial* which relates to
> the question of just compensation should be included when determining
> prevailing party for purposes of § 2412.

*United States v. 50.50 Acres of Land*, 931 F.2d at 1358-59 (emphasis in original).

DIBCO argues that *50.50 Acres* was a bench trial and, therefore, has no

applicability here.   The case is actually closer to this case than DIBCO believes.

As indicated, in *50,50 Acres*, the landowners' expert included severance damages

in his valuation of the property but the district court refused to include severance

damages in its award.  As the appellate court explained:

> Testimony on severance damages by a condemnee is an attempt to persuade
> the court that the value of the land taken includes its value as part of a
> larger tract. *See United States v. Miller*, 317 U.S. at 376, 63 S.Ct. at 281. "It
> is incorrect to think of 'severance damage' as a separate and distinct item of
> just compensation apart from the difference between the market value of
> the entire tract immediately before the taking and the market value of the
> remainder immediately after the taking." *United States v. 91.90 Acres of
> Land, etc.*, 586 F.2d 79 (8th Cir.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct.

23

2162, 60 L.Ed.2d 1045 (1979).

931 F.2d at 1358.

Such "value as part of a larger tract of land" is precisely what DIBCO's appraiser testified to in his "integrated use" valuation in this case.  The district court in *50.50 Acres* rejected, at least implicitly, such a valuation in refusing to include any severance damages in its award.  That the severance valuation was not used by the court in *50.50 Acres* in determining the just compensation award, however, did not preclude its inclusion in the determination of the "prevailing party" issue for purposes of a post-trial EAJA fee application.

Like the landowners' appraiser in *50.50 Acres*, Mr. Walsh gave his "integrated use" valuation testimony at trial in this case and, not unlike the court's decision not to include that valuation in its just compensation award in *50.50 Acres*, the Court here directed the jury not to consider such a valuation in determining its award.  As in *50.50 Acres*, the Court here concludes that the fact that the jury was precluded from considering Mr. Walsh's "integrated use" testimony in determining the just compensation award does preclude its consideration in deciding DIBCO's post-trial EAJA motion for fees.

The legislative history of Section 2412(d)(2)(H) adds credence to such a "plain language of the statute" approach.  First, the House Committee on the Judiciary imposed no limitation on the construction of the statutory provisions:

> A party would be regarded as a prevailing party when the amount it is
> awarded by the court lies at least halfway between the highest amount

24

> testified to on behalf of the government and the highest amount testified to
> on behalf of the opposing party. In other words, the prevailing party is the
> one whose testimony in court is closer to the award.

H.R. Rep. No 120(I), 99th Cong., 1st Sess (1985), *reprinted in* 1985 U.S.Code Cong. &

Admin. News 132, 147.

More importantly, the Committee explained that in adding § 2412(d)(2)(H) to the

EAJA in 1985 Congress's purpose was two-fold: (1) to "terminate the uncertainty. . .

over who is the prevailing party in condemnation actions" and (2) **to "bring[] the**

**Government and the property owner closer together in their land valuations, since**

**they would both have the extra incentive of being determined the prevailing party**

**under the Equal Access to Justice Act.**" *Id.* (emphasis added). "Thus, Congress's

definition of a prevailing party under the EAJA was intended to entice landowners to

refrain from presenting inflated valuation testimony to the jury." *United States v. 2.6*

*Acres of Land*, 251 F.3d at 813. This incentive would be lost if the Court were to exclude

a landowner's proffered "highest" valuation testimony from consideration in the fee

award context.[11]

For all of the foregoing reasons, the Court concludes that DIBCO is not a

"prevailing party" under the EAJA. The plain language of the statute commands this

---

[11] Although DIBCO argues that only Mr. Walsh's lower $6,147,261 valuation should be considered, the Court cannot overlook the fact in spite of the Court's instructions to the jury that it not consider Mr. Walsh's higher "integrated use" valuation or Mr. Moroun's subjective $13 million personal valuation, DIBCO's counsel continued to argue those valuations in his closing argument to the jury. *See* 2/19/02 Tr. pp. 930-931. And, DIBCO continued to argue these proposed valuations in the Court of Appeals.

conclusion.[12]  The highest value attested to by the Government's appraiser is closer to the

final judgment than the highest valuation attested to by DIBCO's witnesses.  Therefore,

DIBCO is not a "prevailing party" under the EAJA.

## D.     THE GOVERNMENT'S POSITION WAS SUBSTANTIALLY JUSTIFIED

Even assuming *arguendo* that DIBCO is a prevailing party, it would not be

entitled to a fee award under the EAJA because the Government's position was

substantially justified.  "Substantially justified" means that the position of the United

States is "'justified in substance or in the main' -- that is, justified to a degree that could

satisfy a reasonable person."  *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541,

2550 (1988); *United States v. 14.38 Acres of Land,* 254 F.3d 71, 2001 WL 502839 (5th

Cir. 2001).  As the Supreme Court observed in *Pierce*, this standard "is no different from

the 'reasonable basis both in law and fact' formulation adopted by. . . the vast majority of

. . . Courts of Appeals that have addressed this issue."  487 U.S. at 565, 108 S.Ct. at 2550

(citing *inter alia, Trident Marine Construction, Inc. v. District Engineer*, 766 F.2d 974,

980 (6th Cir. 1985)).  *See also United States v. 0.376 Acres of Land*, 838 F.2d 819, 827

(6th Cir. 1988) ("The question of substantial justification 'is essentially one of

reasonableness.'" (quoting H.R. Rep. No. 1418, 96th Cong., 2nd Sess. at 13-14, 1980

U.S.Code Cong.. & Admin. News 4953, 4992)).  Thus, while substantially justified

_____

[12]  The Court notes that DIBCO argued for a "plain language" reading of the statute with respect to the "party" issue, but argues against such a plain language reading with respect to the "prevailing party" requirement.  DIBCO cannot have it both ways.

means "more than merely undeserving of sanctions for frivolousness," as the Supreme Court noted, a position "can be justified even though it is not correct," and that a position "can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is if it had a reasonable basis in law and fact." *Pierce, supra*, 487 U.S. at 566, 108 S.Ct. at 2550, and note 2. In other words, to be substantially justified, the position of the government must have a reasonable basis in both fact and law; however, it need not hold a winning hand. *United States v. 14.38 Acres of Land, supra.* The burden of establishing that the position of the United States was substantially justified is upon the Government. *Scarborough v. Principi*, 541 U.S. 401, 415, 124 S.Ct. 1856, 1865 (2004).

DIBCO argues in this case that the United States cannot show that its position in this matter was substantially justified because of "the extremely low value the government ascribed to the Property." *See* DIBCO 4/18/07 Brief, p. 6. In DIBCO's view, the fact that the Government's highest valuation of the property was $923,000 but the jury awarded over $4 million demonstrates that the Government maintained an unreasonable position in this litigation, and, hence, cannot meet its burden of showing substantial justification. *Id.* at 6-7.

DIBCO's argument conflates the notion of a "prevailing party" with "substantial justification" -- an argument that the Sixth Circuit expressly rejected in *United States v. 0.376 Acres of Land*, 838 F.2d 819 (6th Cir. 1988).

27

In *0.376 Acres of Land*, the landowners argued, just as DIBCO argues here, that because both the amount deposited by the government and the value later ascribed to the property by the government's trial expert (which was less than $20,000 more than the deposited sum) was nearly $500,000 less than what the land commission ultimately awarded, the government could not show that the position it took in the eminent domain proceedings was substantially justified. The Sixth Circuit rejected this argument, explaining:

> If Congress had intended to tell courts that the position taken by the government can never be found to have been "substantially justified" where the landowner has prevailed it would have been a simple matter to say so. Congress could have provided a definition of "substantially justified position" written in such a way as to exclude the position of the United States in any eminent domain proceeding where the landowner was the "prevailing party," or Congress could simply have said "Unless the court finds that special circumstances make an award unjust, a court shall award fees and other expenses to the prevailing party (other than the United States) in the case of eminent domain proceedings." Congress said nothing of the sort, however, and we must not write into the statute a provision that Congress did not see fit to put there. [Citation omitted.]

> \* \* \*

> "Prevailing party" and "substantially justified" are separate and distinct terms, and they have separate and distinct meanings. The meaning of the first term has now been supplied by Congress, and the meaning of the second has not. For us to infuse the second with the meaning provided by Congress for the first would obliterate the distinction between the two terms and make one or the other redundant. We simply are not prepared to construe this statute as saying that any position taken by the government in a condemnation case, no matter how reasonable it may be, must be held to have been unjustified simply because the landowner ultimately prevailed.

838 F.2d at 824-25. *See also United States v. Charles Gyurman Land & Cattle Co.*, 836

F.2d 480, 483 (10th Cir. 1987) (the "substantially justified" standard "should not be read to raise a presumption that the Government position was not substantially justified simply because it lost the case." *Id.* (quoting H.R. Rep. 1418, 96th Cong., 2d Sess. 11 (1980)).

Noting the absence of an express definition in the EAJA for the term "substantially justified," in *0.376 Acres*, the Sixth Circuit endorsed the "totality of the circumstances" approach used by the Eighth Circuit in *United States v. 1,378.65 Acres of Land Situated in Vernon County*, 794 F.2d 1313 (8th Cir. 1986) and *United States v. 341.45 Acres of Land* (8th Cir. 1984), *vacated*, 786 F.2d 1168 (8th Cir. 1986).[13]   *United States v. 0.376 Acres*, 838 F.2d at 825-26.  Several other circuits also look to the "totality of the circumstances" in making the substantial justification determination.  *See, e.g., United States v. Charles Gyurman Land & Cattle Co.*, 836 F.2d 480, 485 (10th Cir. 1987); *United States v. 312.50 Acres of Land*, 851 F.2d 117, 118-19 (4th Cir.1988); *United States v. Bradac*, 910 F.2d 439, 443 (7th Cir. 1990)  Under this approach:

> If the government's appraisers are qualified or the other evidence of valuation is sufficient, the government's prelitigation position or offer is substantially justified if it is based upon and consistent with the appraisals or other evidence of valuation.  Similarly, the government's litigation position is substantially justified if the amount established by the government during trial is based upon and consistent with the appraisals or other evidence of valuation.  The district court should focus upon the relationship between the government's offer, the appraisals, and the valuations established by the government's expert witnesses during trial, rather than the relationship between the government's offer or deposit and the property owner's counteroffer, if any, or the jury award. . . .

---

[13]   *341.45 Acres* was vacated without explanation.  Its holding, however, was reaffirmed in *1,378.65 Acres*.  *See 1,378.65 Acres, supra*, 794 F.2d 1318-19.

> The Government's settlement offer should also be close to the valuations established by the Government's expert witnesses during trial, with any substantial disparity between the offer, the appraisals, and the government's trial evidence explained by the Government. The Government's position will not be compared with the landowner's counteroffers or the jury award to determine its substantial justification, because the Government's obligation is to pay just compensation, not premium prices.

*1,378.65 Acres*, 794 F.2d at 1317 (internal punctuation and citations omitted).

In this case, the Government's expert, Donald Treadwell, was a well-qualified MAI appraiser with more than 40 years of experience appraising real estate. *See* 2/12/02 Tr. 370-73. Mr. Treadwell appraised the property using a reliable methodology by first determining that its highest and best use was its existing commercial use, and then by analyzing sales data of comparable properties having similar physical attributes (e.g., size, location) and the same commercial uses. *Id.,* at 383-90. Further, there was no gross disparity between Mr. Treadwell's valuation and the Government's original deposit. In addition, Mr. Treadwell demonstrated that his valuation was reasonably based on the underlying facts by stating that he had discounted the prior sale of the property (i.e., DIBCO's purchase price) due to evidence that it was not an arms length transaction. *Id.*, at 384-85. Mr. Treadwell also rejected the theory of an integrated highest and best use with the Ambassador Bridge, which proved to be a reasonable interpretation of the underlying facts in light of this Court's decision to exclude evidence of that use, *id.*, at 390-405; *United States v. Certain Land*, 188 F. Supp.2d at 757-62, and the Sixth Circuit's ultimate affirmance of that decision.

30

Furthermore, as the Sixth Circuit observed, this case presented a "close question" of law as to valuation, which, as the Court noted, "may explain why these two parcels of land have generated such spirited litigation." *United States v. Certain Land*, 450 F.3d at 211. Although not dispositive, "the closeness of the question is, in itself, evidence of substantial justification." *Bricks v. U.S.E.P.A.*, 426 F.3d 918, 923 (7th Cir. 2005); *see also TKB Int'l., Inc. v. United States*, 995 F.2d 1460, 1468 (9th Cir.1993) ("When the case presents . . . a close question of law, we cannot say the district court abused its discretion in finding the government's position was substantially justified." *Id.*); *Washington v. Heckler*, 756 F.2d 959, 961-62 (3d Cir.1985) ("[I]f the case turns on an unsettled or "close" question of law, the government's position will normally be substantially justified notwithstanding the fact that its legal position is ultimately rejected."*Id.*)

For all of the foregoing reasons, the Court finds that the Government's position in this action was substantially justified. Therefore, DIBCO's motion for attorneys' fees and expenses under the EAJA will be denied.[14]

<u>CONCLUSION</u>

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that DIBCO's Motion to Recover Fees and Expenses Under 24 U.S.C. § 2412 **[Dkt. # 532]** is DENIED.

---

[14] This determination renders it unnecessary for the Court to address the Government's additional "special circumstances" and "unreasonable fees" arguments.

31

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 6, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2009, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager